Reed, J.,
delivered the opinion of the court.
A brief statement in regard to the subject-matter of the controversy and relation of the interested parties will suffice to explain this case. In July, 1887, Mrs. Francina Hawkins *379 was an aged widow of over 70 years, possessed of considerable property, — the amount is not shown. Her heirs were her daughters Maggie A., wife of Nathan S. Hurd, and Nancy the wife of H. A. E. Pickard, both of mature age. There was also one A. E. Mausfield, whom, though he does not appear to have been legally adopted, was raised by the Hawkins from an infant, and was recognized as, or claimed to be, one of the family. Sometime prior to the date given, Pickard and family removed to Denver. The old lady conveyed to her daughter, the wife of Pickard, a residence in West Denver of the admitted value of some $7,000, and also furnished the family money, more or less, as the exigencies of the occasions required.
Mrs. Hurd and her husband, who had received nothing from the mother, felt aggrieved at the apparent partiality of the mother, and, fearing an inequitable division of the estate in the interest of the Pickards, attempted to counteract it.
As claimed by Hurd, the old lady was by him invited to his house, the error of her ways pointed out, and the necessity of doing equal justice impressed upon her; and she, recognizing the justice of the claim and not wishing to offend the Pickards, executed the note in question to equalize affairs between her daughters. The execution and existence of the note remained a secret until after Mrs. Hawkins’ death, when it was presented for allowance against the estate, out of which has grown the present litigation. The Pickard family and Mansfield resisted the claim, as it would materially affect their interests in the distribution of the estate, and asserted the note to be a forgery. Like all other controversies of this kind, where quite an amount of money is involved, the contest degenerated into a personal one, developing great intensity and acrimony. That this should be the case with Hurd is naturally to be expected, for although the crime of forgery is not, by the proceedings, directly charged upon him, and no criminal conviction could follow, all the testimony tends to show that, if forgery, it vras perpetrated by him, and he is morally, if not legally convicted of the crime.
*380 At the opening of the trial to the jurj' the following stipulation was made and entered of record: “ And thereupon counsel for the respective parties agreed that counsel for the respondent might read from the cross-examination of the witness Hurd as given upon a former trial of the cause and as contained in the bill of exceptions made up from a former trial of this cause, wherein the same party was claimant, said cross-examination to be read subject to objections by counsel for the claimant, the same as if the witness Hurd was upon the stand and being orally cross-examined, said cross-examination as read to be considered so far as the same should be admitted as the cross-examination of the witness at this trial, the same as though given at this time in response to oral cross-examination.”
The following are the errors assigned requiring examination : “ 1st. That the verdict of the jury is contrary to law.
“ 2d. That the verdict is not supported by the requisite testimony or any testimony corresponding with the allegations and confined to the point in issue.
“ 4th. That incompetent and prejudicial evidence was admitted at the trial.
“ 5th. That the court erred in failing to give plaintiff’s instruction number two, as follows: ‘ The court instructs the jury, defendant has read to you as evidence a portion of the testimony given by Nathan S. Hurd upon the trial of this case. You are to take what he says regarding the drawing of the note and the circumstances surrounding the giving of it as the facts on which you are to act, unless there is other evidence which countervails them and shows they are other and different from what Mr. Hurd stated them to be; that when a person produces a witness in his behalf he represents such witness as a truthful and creditable person, entitled to be believed. And the fact that Mr. Hurd may feel less friendly to the party who calls him than to the other side, does not change the'rule of the law.’
“ 6th. That the court erred in giving the last instruction to the effect that the jury had a right to consider the eon- *381 duct and deportment of a witness upon the stand and their apparent bias or prejudice, because there was no evidence to predicate this instruction upon.
“ 7th. That the court erred in admitting the testimony of witness Stopes, and that the subsequent striking out of this testimony did not cure the error.” .
The second error assigned raises the question of the sufficiency of the evidence to support the finding of the jury. It is ably argued that it is insufficient. Ordinarily, it is the well settled rule of courts of last resort that questions of fact found by a jury when supported bjr competent testimony will not be disturbed, even though in the opinion of the court the preponderance seems to be the other way; this is the rule in civil cases, but in this there are peculiar circumstances, though in the nature of a civil suit; it is, at least, quasi .criminal and imposes upon the one person who was interested, and the only one who had the opportunity, all the results of the crime of forgery save the penalty.
The case is also complicated by the peculiar stipulation in <■ regard to evidence made by counsel. Why, with only one issue to be tried, viz., the genuineness of the signature, with all the witnesses in court or easily accessible, such a stipulation became necessary, and counsel allowed to read such parts as they might select from testimony taken at the former trial where two or three important issues were tried, is hard to determine. That it opened wide the door for the admission of irrelevant and impertinent evidence and consequent errors, will at once become apparent.
Under the circumstances the form of the verdict is peculiar. “ We the jury find the issues herein joined for the defendant.” There was but one issue. The form of the verdict suggests a very grave question, whether or not the jury were misled by the introduction and reading of the evidence taken on the former trial and considered it a duty to determine all the issues involved in the former case. The form of the verdict and the use' of the plural, “ issues,” would seem to indicate that more than one issue had been consid *382 ered and determined, — the language is very suggestive of the misapprehension. By the first instruction the jury were instructed that there was but one question to be determined, viz., the genuineness of the signature; this instruction seems to have been entirely disregarded.
To sustain the genuineness of the signature Nathan S. Hurd was called and testified as follows:
“ Q. Mr. Hurd, what is your full name? A. Nathan S. Hurd. Q. What position do you occupy under the state government? A. I am deputy superintendent of insurance, in charge of the insurance department of the state. Q. Did jmu know Franeina Hawkins in her lifetime? A. I did. Q. Look at that signature at the bottom of that note and state whether or not you saw Franeina Hawkins sign that note (showing witness the note in controversy in this suit) ? A. That is the signature of Franeina Hawkins, and I saw her sign it.”
No oral cross-examination was had of the witness. Counsel for the defendant preferring to rely upon the cross-examination had at the former trial, proceeded to read from the former bill of exceptions at considerable length. All that admitted, appeal's to have been pertinent and proper cross-examination. No important fact or evidence was elicited, except the fact that the witness testified that the note was drawn and executed on the day of its date, in the afternoon, at his house, which statement afterwards became an important factor in the case. At this point the further reading' of the former testimony of Hurd was objected to by counsel of plaintiff as not cross-examination, and the objection was sustained by the court. The following colloquy between counsel and court ensued:
“ Mr. Patterson — I suppose that all questions that were propounded touching the interlineations, the time when the first part was written and the part where the interlineations were made, will be objected to and will be sustained ? Mr. Rockwell — Yes, sir. The Court — Yes, sir. Mr. Patterson— And it will be considered that those questions were pro *383 pounded and objections made and sustained ? Mr. Patterson —There is a lot of evidence here about immediately before and after the time the note is said to have been executed. The Court — Do you object to that? Mr. Rockwell — Yes, sir, we object to all that. I don’t think there is a question from there down but-what would be objected to; I am satisfied there is not a question there that we would not object to, all his entire cross-examination there for twenty odd pages. The Court — The objection will be sustained. Mr. Patterson — If j’our honor please, there is nothing further in this testimon3- that does not come under the objections at this point.”
Plaintiff then put the note in evidence of which the following is a copy, with the indorsements:
“Denver, Colo., Juiy 30, 1887.
“ In considération of the payment of three hundred dollars in cash, the receipt whereof is hereby acknowledged, and other good and valid consideration I promise to pay to Maggie A. Hurd the sum of eight thousand dollars thirty months after date, with' interest at eight per cent per annum from date until paid, interest payable every six months or to be compounded. Francina Hawkins.”
(Indorsed on back.)
“ 22 Est.
Francina PIawkins.
Exb. A., A. W. G-.
“ Pa3^ to Steel & Malone or order. Maggie A. Plurd. Pay to Jno. F. Tourtelotte or order. Steel & Malone. Pay to M. L. Tourtelotte or order. Jno. F. Tourtelotte.”
And thereupon the claimant rested Kis case.
And the respondent, to maintain the issue on his behalf herein, introduced and offered the following evidence, and proceeded to read in evidence on behalf o£ the respondent from the cross-examination of the witness Hurd as given upon a former trial of this cause, wherein the same party was *384 claimant, said cross-examination being contained in the bill of exceptions as made up from said former trial.
Counsel for defendant read some 20 pages of the bill of exceptions, being the balance of the cross-examination of the witness Hurd taken upon the former trial, excluded by the court as cross-examination. A careful examination of it shows nothing to weaken or in any wajr qualify the statements made in the direct testimony. Much of it seems to be made up of the history of himself and mother-in-law, their relations, the relations of the mother-in-law with the Pickard family, of her advances to them and the duty she owed witness’ wife in equalizing her gifts and the incidents leading up to and the execution and delivery of the note, etc., etc.
By this proceeding counsel for defendant made the witness, and consequently his testimony, his own. The rule is clearly stated in 1 Greenleaf, Ev., sec. 442 as follows: “ When a party offers a witness in proof of his cause, he thereby, in general, represents him as worthy of belief. He is presumed to know the character of the witnesses he adduces; and having thus presented them to the court, the law will not permit the party afterwards to impeach their general reputation for truth, or to impugn their credibility by general evidence, tending to show them to be unworthy of belief. For this would enable him to destroy the witness if he spoke against him, and to make him a good witness if he spoke for him, with the means in his hand of destroying his credit if he spoke against him.”
To this rule there are exceptions: 1st. Where the witness is one the law obliges him to call as the subscribing witness to a will or deed ; in such case he is not considered the witness of the party calling him and may generally be impeached.
2d. Where the party producing the witness has been misled and deceived by him and bis evidence varies from former statements. The evidence here falls under neither exception. Counsel certainly could not be surprised, as the evidence was in print and familiar to him.
As to the general rule stated and that the defendant was *385 bound by and could not discredit the evidence of Hurd and was concluded by it, except where a different state of facts in regard to the same proposition was established by other competent evidence. See Buller, N. P. 297; Ewer v. Ambros, 3 Barn. & C. 746; Stockton v. Demuth, 7 Watts, 39; Smith v. Price, 8 Watts, 447; Sewall v. Gardiner, 48 Md. 182; Pollock v. Pollock, 71 N. Y. 137; Warren v. Gabriel, 51 Ala. 235; Railroad Co. v. Stimpson, 14 Pet. 448; Floyd v. Bovard, 6 Watts & Sergt. 75.
Another and very serious irregularity was the fact that the 20 odd pages of the former examination of Hurd read to the jury, held by the court not to be admissible, as cross-examination, was not covered by the stipulation; the only way any of the former evidence of witnesses, present upon trial, could be made admissible was by virtue of the contract.
Defendant could have called witness Hurd and examined him orally for the defense. That read, not being covered by the stipulation, was -not evidence any more than if the witness had never been sworn, or more than any other mass of material that might have been dragged in.
The same irregularity occurred in admitting the former evidence of John F. Tourtelotte taken by the plaintiff; Tourtelotte could have been called. Counsel stated “We propose to put in evidence all the testimony we have upon the subject of bonafides.” “ Allowed by the court.” The direct evidence of Tourtelotte upon the former trial was read, and there the evidence and the attempt to impeach the bonafides stopped short as far as the evidence was concerned. By this proceeding the defense made the evidence of Tourtelotte their own and were bound by it. No rule of evidence is better settled, than that a party cannot call a witness for the sole purpose of discrediting or contradicting him. “ It is a well settled rule that a witness cannot be cross-examined, as to any fact which is collateral and irrelevant to the issue, merely for the purpose of contradicting him by other evidence.” 1 Greenleaf, Ev., sec. 449; 1 Stark, Ev. 164; *386 Spencely v. De Willot, 7 East, 108; Henman v. Lester, 12 C. B. N. S. 776; Combs v. Winchester, 39 N. H. 1.
“ If a question is put to a witness which is collateral or irrelevant to the issue, his answer cannot be contradicted by the party who asked the question ; but it is conclusive against him.” 1 Greenleaf, Ev., sec. 449; Hanis v. Tippett, 2 Camp. 637; Eames v. Whittaker, 123 Mass. 342; Kaler v. Ins. Co., 120 Mass. 333; Hester v. Commonwealth, 85 Pa. St. 139; State v. Benner, 64 Me. 267.
The testimony could not be used to get a new and a false issue before the jury, nor could his testimony nor that of Hurd be used as a text in argument by counsel to discredit it.
What influence these irregularities had upon the result cannot be known — that they were baneful must be apparent.
In the former opinion in this case at page 418 it was said : “ By the law merchant a purchaser is presumed to be a holder for value, and to have purchased in good faith any paper before its maturity, and this presumption must be overcome by competent testimony. Where there is no testimony impeaching the bonafides of the transaction of the holder, it is error to admit evidence of want of consideration, fraud in obtaining, irregularity in transferring, and the knowledge of defects or defenses by the intermediate holders or indorsers.
“ There was absolutely no testimony to show that the plaintiff was not a bona fide holder for value. All the testimony upon the transaction was in favor of its regularity and legality.”
By this it will fully appear that, without new and affirmative evidence, subsequently discovered, by which the bona fides of the transfer could be impeached, the issue was fully and finally determined. The evidence of Tourtelotte was not covered by the stipulation. It was the direct evidence on behalf of the plaintiff at the former trial, — was clearly inadmissible for any purpose. With no evidence but that, the proceeding was grossly disrespectful to this court, and evidently was only intended to inject another issue into the trial to prejudice the case of the plaintiff by collateral matter, and *387 furnish a subject for argument to the jury. It is clear from the form of the verdict that the jury, by this proceeding or by some other injected element, was misled as to the number of issues involved, leaving it doubtful, whether the only issue, the question of the forgery, was decided. As in the former trial, for all that appears, the case may have been decided upon another issue and the question of forgery left undetermined. The proceeding was irregular, and the court erred in permitting it. The form of the verdict, its uncertainty and indefiniteness, taken in connection with the peculiar and anomalous proceedings, are sufficient to discredit the entire trial and judgment.
The peculiar course adopted in the introduction of improper material as evidence, rendered instructions as to its legal effect necessary.
Instruction number two, asked by the plaintiff, or its equivalent should have been given, and a failure to instruct on the law involved was error.
In a trial in the county court on October 14,1889, pertaining to the same note, wherein Steel & Malone were plaintiffs, which suit was afterwards dismissed by the plaintiffs, one Arthur Stipes gave testimony tending to impeach the genuineness of the note; his evidence was taken down by a stenographer; upon the trial of this cause Stipes could not be found. • Counsel for defense proposed to read his evidence in that case as evidence in this. Objection was made, overruled and exception taken. “ Witness reads from stenographic notes taken October 14, 1889, testimony of witness Stipes given at the trial of the case of Steel & Malone, claimants against the estate of Franeina Hawkins, before the county court,” and read the same to its conclusion. Which testimony tended to show that upon Sunday, July 31, 1887,- she was at A. E. Mansfield’s farm at Arvada, both in morning and in afternoon. In the morning he had come to town for a harvester, and about four o’clock in the afternoon he again went there to borrow a portion of the harvester, to put upon a harvester which he was moving from Allen’s place to that *388 of Mrs. Wilson adjoining Mr. Mansfield, and that he saw Mrs. Mansfield and her mother-in-law, Mrs. Francina Hawkins, at Mansfield’s place.
After this testimony was given and at the conclusion of the introduction of testimony, defendant’s counsel stated to the court, “ They withdrew from the consideration of the jury all of the testimony given by Stipes.” Whereupon the court said to' the jury: “ The court admitted the evidence of Arthur Stipes’to be read in evidence over the objection of the plaintiff’s counsel. We now withdraw that evidence from the consideration of the jury, and you are instructed, not to consider the evidence of Stipes in determining the issues between these parties, and let the record so show.”
The evidence having been taken in a different proceeding, with different parties, although pertaining to the same note, was clearly inadmissible, as much so as if taken in a matter entirely foreign to the controversy. Its admission was error, which was not cured by the attempted withdrawal. Counsel cannot put immaterial, incompetent and improper testimoity before a jury, allow it to remain there to the close of the trial, and cure it by a formal withdrawal, which, if heard by the jury might utterly fail of comprehension, and having been impressed upon the minds of the jurors, have had all the effect'it could have had if competent. Such practice cannot be too severely criticised. In support of these propositions: Erben v. Lorillard, 19 N. Y. 299; Furst v. R. R. Co., 72 N. Y. 547; Peck v. Yorks, 47 Barb. 131; Scripps v. Reilly, 35 Mich. 371.
In the former case the court said, .by Grover, J.: “ The plaintiff’s counsel insists that this (if error) was cured by the charge. When illegal evidence, properly excepted to, has been received during a trial, it must be shown that the verdict was not affected by it or the judgment will be reversed. If the evidence may have affected the verdict, the error cannot be disregarded. The rights of parties can only be preserved by adhering to this rule. It would be vain to observe the rules prescribed by law to secure an impartial *389 jury, if their minds are to he subjected to the influence of illegal evidence after they are impaneled. It does not follow that impressions thus obtained will have no effect, although the judge directs them to disregard the evidence.”
In Furst v. R. R. Co., supra, such an error was the only one considered and the judgment was reversed.
Nearly all of the evidence having been that put in upon a former trial, we are relieved of the embarrassment, consequent upon the rule in regard to the examination of oral testimony, and it becomes the duty, or at least the privilege of the court to examine the entire evidence introduced to determine whether the jury was warranted in its findings.
First. Taking up the evidence of the plaintiff to establish the genuineness of the note, we find it conceded that Mrs. Pickard and Mrs. Hurd were the only children and legal heirs of Mrs. Hawkins, that she had by deed of conveyance of real property and supplies of money made advances to the Pickards of somewhere from $7,000 to $10,000, while the Hurd family had received nothing. It was very natural that the circumstances should prompt the Hurd family to seek to equalize matters and secure a proper share of the estate, by calling the attention of the mother to the apparent injustice, and her duty to correct it. It is apparent that at that time ill feeling existed between the two families in regard to the estate of the mother. Such being the fact and the mother recognizing the justice of the Hurd claim and not wishing to intensify existing family feuds, she and Hurd might very readily have adopted the plan of the note, for a sum sufficient to equalize advances to the Pickards, on long time presumably, as realty happened, payable after her death. These uncontradieted facts, while not conclusive, become very potent in explaining what otherwise might be considered questionable and doubtful, by showing the justice of the demand and the mother’s recognition of it. These explanatory circumstances afford strong presumptions in favor of the integrity of the note, and cannot be rejected in an examination of the case.
*390 Second. We have the evidence of Mr. Hurd detailing all the facts leading- up to the execution of the note, the blanks left by him in drawing it, the consultation and agreement as to filling the blanks, the filling of them, the signature in his presence and delivery of the note. Mr. Hurd was not impeached nor was any effort made to do so; he is not contradicted in any important particular, except by circumstances supposed to be inconsistent. A careful examination of his entire testimony, not only that properly, but improperly admitted, fails to show anything contradictory, or detracting from the truth of his direct evidence. Leaving out of consideration the evidence of his daughter in regard to seeing her grandmother on some occasion sign a paper at her home, as too indefinite to identify the note in controversy, consequently of little value, also the evidence of the son in regard to genuineness of the signature, in his opinion, we come to the evidence of the experts who testified in the case.
Mr. Denman, Mr. Rose, Mr. Frashier, Mr. McCrimmon and Mr. Young, all men whose business it has been for years, as bankers, to examine and pass upon signatures, and who showed themselves fully qualified as experts, upon careful comparison of the signature in question with numerous others, admitted to be genuine, they each and all unhesitatingly declared in favor of the genuineness of the signature.
Eighteen signatures of Mrs. Hawkins, including the one in question, seventeen of which were proved and conceded to be genuine, were submitted to the experts for comparison, and all are photographed and submitted to the court.
There is no branch of scientific or expert evidence more satisfactory than that of capable and disinterested witnesses whose business,for life has been in the line of examination of signatures. The conclusion reached is not an opinion, as in ordinary expert scientific evidence, but the result of comparison by those skilled and trained to compare, and who would readily detect any marked or unnatural deviation from the normal in the mechanical execution of the signature questioned. It is more in the nature of fixed mechanical science *391 than of opinion or hypothesis. Yet, not one of the five detected anything to throw doubt upon the authenticity of the signature.
No experts were called upon the part of the defen dant, those attacking the genuineness of the signature, on comparison and examination, and their knowledge of Mrs. Hawkins’ signature from having frequently seen her write it, were Mr. Pickard, his wife, young son, and Mr. Mansfield, all interested in the result.
We shall not attempt to analyze and discuss the testimony of these witnesses. We can only give our conclusions, after a very careful examination. Mr. Pickard said “ He did not believe it was her signature,” and proceeds to give his reasons for his belief in a very lengthy and elaborate explanation, which is vague, speculative, and confused, which, in our opinion, weakens instead of strengthens his position. Much, if not all of it would apply with equal or greater force to each of the signatures shown to be genuine. Mrs. Pickard upon the former ¿rial (Steel & Malone) testified that she could not tell whether it was or was not the signature of her mother; upon the trial of this cause, with no greater means of knowledge than she formerly had, she testified that it was not her mother’s signature. On direct examination she was asked, “ Have you examined the signature purporting to be hers upon this note ? A. Not very closely. No, sir.”
Upon cross-examination (speaking of the former trial).
“ Q. And you stated you could not tell whether it was or not? A. I was undecided, I said so.
“ Q. Now you say it is not her signature? A. Yes, sir. :
“ Q. What has led you to change your mind? A. I have had closer examination, and circumstances connected with it.’’ No matter how honest the witness was in her conviction, nor how satisfactory to herself her reasons were, her evidence could be of very little value. The youth, son of Mrs. Pickard, showed himself, by reason of inexperience and want of opportunities, unqualified to judge, and what he thought about it was unimportant;
*392 The other witness, Mr. Mansfield, arrives at the same conclusion as Mr. Pickard for the same reasons, viz., the signature is too regular, lacks the nervousness that characterizes the signature known to be genuine, and the language 'of himself and Pickard is so identical in one respect that it is worthy of notice. Mr. Pickard: “ It might do for twenty or thirty years ago, but for the last five years she could not sign her name with the steady hand that it seems that was written by.” Mr. Mansfield said, “ It is written there like she might have written twenty-five or thirty years ago, a steady hand.”
This being the basis of the judgment of each, an examination and comparison of .the signatures by any one, whether expert or not, shows that the conclusion could hardly have been reached without the aid of interest or imagination of both.
This brings us to the main defense relied upon, an alibi on the part of Mrs. Hawkins on the day the note bears date and the day Mr. Hurd testified she executed it at his house in the afternoon, by attempting to show that she was at the house of Mr. Mansfield, seven or eight miles in the country, from the day preceding until two days afterwards. But a very brief review of the testimony upon the point can be had, or is deemed necessary. Mrs. Hawkins was the foster mother of Mansfield. His testimony and that of his wife was that Mrs. Hawkins visited them frequently during the summer of 1887. Two years and a half afterwards this case came on for trial; then the note in question was examined and the attempt made to establish the fact of Mrs. Hawkins having been at their house on the day the note bore date, and thus, inferentially, discredit it, not by showing- that Mrs. Hawkins did not execute the note, but by showing that she did not do it on the day testified to by Hurd, thus, by establishing a collateral fact in connection with the date, attempting to establish the forgery. Human memory is so defective that it was apparently realized that unless fortified strongly by circumstances and other facts, corroborative, *393 that particular date could not be fixed out of the numerous dates she visited; so the purchase of a harvester, the making of a note in payment, of the same date as the note in controversy, and the taking the machine home are invoked to fix the date.
It appears that upon the Steel & Malone trial the note given for the machine was exhibited, afterwards lost or misplaced, and never put in evidence in the trial of this cause; consequently its existence, the date and everything pertaining to it, was the oral evidence of those that had seen it. Admitting its existence and its date to have been stated, still the whole fabric rests upon the testimony of Mansfield that he made it on the day it bore date.
Mrs. Mansfield’s evidence is of very little value, for she admits that her knowledge of the date and even the existence of the note was derived from her husband. Allowing all these collateral facts to have been properly established, which they were not, they could have no bearing upon the question of the genuineness of the signature, would only show that it was not executed on the day of its date, and would only show that Hurd had either been mistaken as to the date or Mansfield mistaken in his dates, but’ could not establish the forgery. Forgery cannot be established by inference from some other facts, and these facts dependent upon memory for that interval of time. The defense and allegation contained in the answer is as follows: “ Because the said note is not the act and deed of said Francina Hawkins and she did not execute the same and the said note is a forgery.” The defendant, had the affirmative of this issue, and having alleged the fraud and forgery was bound to establish it by a preponderance of competent evidence. The legal presumption was in favor of the regularity and authenticity of the paper. The rule is well stated by Valentine, J., in Long v. West, 31 Kans. 298: "In the absence of evidence to the contrary, honesty and fair dealing in all transactions are always presumed, and if any person claims that there was fraud in the transaction it devolves upon such person to prove *394 the fraud, and it does not devolve upon the party charged with committing the fraud to prove that the transaction was honest and bona fide.”
In Mead v. Conroe, 118 Pa. St., it is said “ There are, of course, many small circumstances in evidence which might be expected if there was a fraudulent purpose, but they were equally consistent with an innocent purpose and hence do not, of themselves, whether taken singly or collectively, justify an inference of fraud. While fraud may be proved like any other fact by evidence tending to establish its existence, yet it was a serious accusation and is not to be lightly inferred.” And in Morton v. Weaver, 100 Pa. St. (3 Out.) 52, it was said, “ It is not enough to charge fraud and prove in support thereof slight circumstances of suspicion only. To be of any avail it must-be clearly proved.” It was said in Parlin v. Small, 68 Me. 289, “ The evidence of fraud in order to vacate an executed instrument, must be clear, strong, satisfactory and convincing.” See also Bigelow on Fraud, 123 and 124; Simms v. R. R. Co., 60 Md. 404; Schofield v. Blind, 33 Iowa, 175; Lyman v. Cessford, 15 Iowa, 229; Purcell v. Miner, 4 Wal. 513; Sprague v. Dodge, 48 Ill. 142; Chaffee v. U. S., 18 Wal. 516; Kerr v. Russell, 69 Ill. 666; Russell v. Baptist etc. Union, 73 Ill. 337.
In a case of the magnitude of this, and where the result is so serious as to morally convict a party of crime, the evidence establishing the forgery must be competent and all that is legally required. It must be satisfactory in every respect; nothing less than clearly satisfactory evidence should be permitted to defeat the note and place upon the witness Hurd the obloquy of crime. In this case there is no such evidence. Examined and analyzed, it is found utterly insufficient to overthrow the evidence of the plaintiff. It, at most, only raises a presumption or suspicion of fraud by setting up an illy founded and poorly authenticated set of facts, from which fraud and crime might be inferred. Under such circumstances the verdict should not be permitted to stand. It was evidently the result of mistake or of willful bias and in direct *395 disregard of the instructions of the court. For reasons given, the judgment will be reversed and the cause remanded for a trial de novo.

Reversed.

Bissell, P. J., concurs.
Thomson, J., dissents.