[No. 4839.]

## BOLES v. THE PEOPLE.

1. **Appellate Practice—Verdict—Conflicting Evidence—Domain of Jury.**

    The rule is fixedly settled in this jurisdiction that the verdict of a jury based on evidence substantially conflicting is binding upon the appellate court. The domain of a jury as to matters of fact is as sacredly free from invasion by the appellate court as is the appellate court's domain as to matter of law free from invasion by the jury.—P. 47.

2. **Practice in Criminal Cases—Evidence—Declarations of Third Parties Not Communicated.**

    In a prosecution for murder, when the father had not attempted to identify the defendant as the murderer, it was proper to sustain an objection to a question asked him as to whether he had received from a spiritualistic medium any communication as to who had murdered his son, it not being shown or suggested that he had ever communicated anything so stated to him to the identifying witness or to any one else.—P. 48.

**3. Practice in Criminal Cases—Conduct of Judge—Interference with Cross-examination.**

In a prosecution for murder, the identifying witness, who was present at the commission of the crime, was asked on cross-examination if she hadn't told a police officer that the murderer had a cap drawn over his face and ears, to which she replied that she did not know. She was then asked if she had said so, how she saw the frown upon his brow, to which she replied that she saw the frown by the rays of an electric light. She was further asked if she saw through the cap that covered his ears and face, and, upon an objection being sustained to such question, she was further asked in what way she saw the frown upon his brow, at which time the court interposed, and asked witness if she saw the frown with her eyes, to which she replied in the affirmative, and the court then remarked, "Then say so." Held, that, under the circumstances, the remark of the court was not erroneous as rescuing the witness from a dilemma, nor did it show prejudice or ill-will toward the defendant.—P. 49.

**4. Witnesses—Cross-examination—Interference of Court.**

Although the trial court may have interfered with the cross-examination of a witness by defendant's counsel, in the absence of any showing that plaintiff in error was injured thereby, no reversible error exists.—P. 50.

**5. Practice in Criminal Cases—Evidence—Witnesses—Cross-examination—Admitted Facts.**

Where, in a prosecution for murder, it was an admitted fact in the case that a certain newspaper had paid the expense of extraditing the defendant, there was no error in stopping the cross-examination of a witness by defendant's counsel after such counsel had announced that his object was merely to show such fact.—P. 50.

**6. Practice in Criminal Cases—Evidence—Cross-examination—Re-direct Examination.**

In a prosecution for murder, it appeared from the evidence that, at the time of the commission of the crime, two fingers of the murderer's right hand were bitten, and a physician testified that two fingers of the right hand of defendant were in a contused condition the morning after the murder, and that such condition was as if the fingers had been bitten; Held, that it was proper on a cross-examination to ask the physician as to whether he had inquired the cause of the injured condition of the hand of the patient; and that it was also proper, on re-direct examination, to ask him as to his reasons for not making such inquiry.—P. 51.

**7. Practice in Criminal Cases—Evidence—Cross-examination—Conduct of Court—Indications of Ill-will.**

In a prosecution for murder, a physician who testified for the state was asked by defendant's counsel whether he had not talked with the latter in the jail on a certain afternoon, and witness responded in the negative. Held, that the sustaining of an objection to a second question of the same kind with an admonition not to ask it again, was not erroneous, nor did it indicate ill-will on the part of the court toward defendant.—P. 51.

**8. Practice in Criminal Cases—Evidence—Witnesses—Impeachment—Immaterial Matter.**

In a prosecution for murder, a physician testified that, on the day following the crime, he dressed certain wounds similar to those shown to have been received by the murderer at the time of the commission of the crime, and that thereafter, on a certain day, he saw the defendant at the jail and recognized him as the man whose wounds he had dressed. On cross-examination the witness denied having had any conversation with defendant's counsel at the jail at the time in question, and the latter sought to testify that the witness had had a conversation with him at such time and place. Held, that it was proper to exclude such testimony, as it tended merely to contradict the physician on an immaterial matter, and, further, there was no proper foundation laid for such question.—P. 52.

**9. Practice in Criminal Cases—Exclusion of Evidence—Harmless Error.**

Where, in a prosecution for murder, it appeared that there was some discrepancy between the description of the murderer given out by the chief of police shortly after the commission of the crime, and the description subsequently given by the witness who identified defendant, and the chief of police testified that he obtained the description from such witness. Held, that there was no prejudicial error in overruling the objection to a question, asked the chief, on cross-examination by the state, as to whether the sister and mother of the identifying witness did not give him a description of the criminal before he obtained a description from the identifying witness.—P. 53.

**10. Practice in Criminal Cases—Evidence—Question for Jury—Credibility of Witness.**

In a prosecution for murder, one present at the time of the commission of the crime, and who identified the defendant, testified that she had left her skates where the murder was committed, and that they were unstrapped at that time. Held, that the

fact that when the skates were found they were strapped to-
gether was simply a question for the consideration of the jury,
as going to the credibility of witness.—P. 54.

*Error to the District Court of the City and County
of Denver.*

*Hon. N. Walter Dixon, Judge.*

Russell Boles was convicted of murder in the
first degree. He brings error.            *Affirmed.*

Mr. J. MAURICE FINN and Mr. O. N. HILTON, for
plaintiff in error.

Mr. N. C. MILLER, attorney general, and Mr. I.
B. MELVILLE, assistant attorney general, for the peo-
ple.

Mr. JUSTICE GUNTER delivered the opinion of
the court:

The jury found the defendant guilty of murder
in the first degree and fixed as the penalty life im-
prisonment at hard labor. Sentence was pronounced
accordingly. The case is here for review.

1. It is said the verdict is not sustained by the
evidence. The murder charged was that of Harold
Fridborn, committed in this city, Dec. 31st, 1901.
A criminal assault was made upon Florence Frid-
born, the sister of Harold. Florence was then about
sixteen years of age, Harold about fifteen. Harold,
who was then with his sister, begged the assailant to
spare her. The answer was a death blow to Harold
from an axe in the hands of the assailant.

A theory of the defense is that the murder was
committed by a paramour of the sister to conceal the
illicit association. This contention is cruel and clear-
ly unjust to the unfortunate girl, who has suffered so
terribly through the assault upon herself and the
murder of her brother. We will not go into details

as to this phase of the case. The tender years of the assaulted girl, the torn and soiled condition of her apparel, her very serious physical injuries, her then violated virginity and her great physical and mental suffering consequent upon the assault without even the other strong corroborative circumstances which were present, exclude the possibility of the association having been other than the result of a fiendish criminal assault.

In further support of his contention that he is not the party who committed the murder, defendant has interposed the special defense known as an alibi. The crime charged was committed as stated upon Dec. 31st, 1901, in the city of Denver. This defendant was found in New Westminster, British Columbia, in Sept., 1903, going under an assumed name, and was there arrested on this charge. Florence was taken there to determine whether the party so arrested was the party guilty of the assault upon her and the murder of her brother. Many persons had before that time been presented to her for identification as the murderer. In each instance she had pronounced the party presented as not the guilty party. Before going to the jail at Westminster where the defendant was confined, she was cautioned by her father and officer Carberry from Denver to be careful and to make no mistake. She was warned of the serious consequences of such mistake to the party wrongly identified and to the state. She there promptly identified the defendant as the murderer. The identification was positive and has continued to be positive. The extreme agitation of the defendant when then presented to her was a circumstance in corroboration. The girl had ample opportunity at the time of the assault, both as to time and artificial light, to see and know the assailant. Further, he was of marked characteristics of person and dress. He

had a heavy and peculiar frown, a mustache, a beard of some days growth, a shuffling gait and a peculiar voice. As to his dress, he wore a cap pulled down over the ears, a long brown overcoat and Florence thought a gold band ring on the middle finger. Florence gave substantially this description of her assailant, the murderer, immediately after the homicide. The trial jury had better opportunities than ours for determining whether the defendant answered this description and whether the identification by Florence was correct. Much evidence corroborates the testimony of Florence and goes in support of the correctness of her identification of the defendant as the murderer. The defendant was dressed at the time of the homicide as Florence says the murderer was. There was evidence that the defendant was wearing a ring of the character and upon the finger described by Florence. Defendant was seen in the vicinity of the place of the murder near the time it was committed. The assault on the girl was made upon ground where ashes had been dumped. Defendant was seen near the place of the murder soon after it was committed, in a nervous, excited condition with ashes on his shoes and on his pants below the knees. The murder was committed with an axe. There was evidence tending to trace this axe to the possession of defendant at the time of the killing. At the time of the assault the girl bit two fingers of the assailant. On the day following the murder the hand of the defendant was in a wounded condition which might have been caused by the bite.

There was evidence that on the morning after the assault and murder the defendant threw away his lower underwear, which it is reasonable to suppose, in view of the condition of the clothing of the girl, bore evidences of the assault upon her.

We have thus stated sufficient of the evidence for the people to show the substantial character of the evidence upon which the verdict rested.

To overcome the case so made, the defendant denied that he committed the assault or the murder, adduced evidence for the purpose of contradicting or explaining much of the criminating evidence against him. He introduced evidence for the purpose of showing that he was elsewhere in the city of Denver at the time the murder was committed.

To sum up, the evidence was substantially conflicting. According to the testimony of Florence Fridborn, strongly corroborated by other evidence for the state, defendant was guilty of the murder charged. According to the testimony of the defendant, tending to support which there was evidence, the defendant was not the murderer. An issue of fact upon which the evidence was substantially conflicting was thus presented to the jury for determination. The jury saw and heard the two main witnesses, the assaulted girl and the defendant. It also saw and heard all other witnesses in the case. It is unnecessary for us to state the familiar reasons why the jury has opportunities superior to those possessed by us for passing upon the credibility of witnesses and reaching correct conclusions as to matters of fact. The rule is fixedly settled in this jurisdiction that the verdict of a jury based on evidence substantially conflicting is binding upon us. The domain of a jury as to matters of fact is as sacredly free from invasion by us as is our domain as to matters of law free from invasion by it. While this rule precludes our disturbing the verdict in this case, we have not rested our conclusion solely upon it, but in aid of our investigation have gone, as we are not compelled to do, to the transcript of the evidence. After careful examination of the evidence we are

satisfied that the defendant has no ground for complaint that the verdict is not sustained by the evidence. Counsel say that the jury must have entertained some doubt as to defendant's guilt, otherwise it would have affixed the death penalty. The lawyer of experience, whether on the bench or at the bar, is familiar with the great hesitancy of the ordinary jury to make a capital conviction upon any state of the evidence. This reluctance is much more likely to have been the cause of the failure of the jury to convict capitally in this case than a reasonable doubt of the defendant's guilt. Certain it is, there was abundant evidence to sustain the verdict.

2. Counsel for defendant inquired of the father of Harold Fridborn, when upon the witness stand, if he had received from a spiritualistic medium any communication as to who had probably murdered his son. An objection to this question was sustained. Notwithstanding the objection, however, the witness answered: "No, sir." This ruling is assigned as error. The father did not attempt to identify the defendant as the party committing the murder. It was not shown or suggested that the witness had ever communicated anything stated to him by the medium to his daughter or to any one else. There was an entire absence of any intimation that the communication by the medium, if made, was material to the case. Therefore the court rightly rejected it. Further, the answer of the witness, which was not withdrawn, showed that the father had never received from the medium any intimation as to who the medium thought had committed the murder.

3. During the cross-examination of the assaulted girl, Miss Fridborn, the following took place:

"Q. Did you not tell Captain Leyden on the second day of January that he had a cap drawn down over his ears and face?

A.   I don't know.

Q.   Well then, if you say that will you explain to the jury how you saw the frown upon his brow?

Objected to by counsel for the people. Objection sustained, to which ruling of the court said defendant, by his counsel, then and there duly excepted.

Q.   Will you please explain to the jury how you discovered this frown upon his brow?

A.   Well, because I saw it.

Q.   Did you see it through the cap that was covering his face and ears?

A.   No, I saw it in the rays of the electric light.

Q.   Did you see it through the cap that covered his ears and face?

Objected to by counsel for the people. Objection sustained, to which ruling of the court defendant, by his counsel, then and there duly excepted.

Q.   In what way then did you see the frown upon his brow?

A.   I don't understand that question.

Q.   In what way did you see the frown on his brow?

The Court:  Did you see it with your eyes?

A.   Yes.

The Court:  Then say so.

We save an objection to the remarks of the court."

It is contended by counsel that the remarks of the court rescued the witness from a dilemma and indicated decided prejudice and ill-will against the defendant. Possibly the remark of the court indicates some irritation, but not of such a character as suggests any ill-will to the defendant or prejudice against his cause. Counsel had been examining this girl witness, age sixteen, upon a false hypothesis; that is, that she had said that the cap was pulled

4

down over the face and ears of the defendant so that the frown could not be seen. The examination had proceeded for some time upon this false assumption. Counsel was upon this assumption in effect arguing with the witness. Further, she had answered counsel fully and freely. The manifest purpose of the court was to check this character of examination and to prevent a waste of time. We do not think he erred.

4. Complaint is made that the court, of its own motion, interfered with the cross-examination of the witness Knott. Counsel is in error as to the interruption being upon the court's own motion. It was moved by a general objection of counsel for the people; but, however this may be, counsel for plaintiff in error has not called our attention to any particular in which plaintiff in error suffered any prejudice whatever from the action of the trial judge, nor do we discover any.

5. During the cross-examination of Detective Carberry, counsel for defendant was stopped in his cross-examination after the court had asked him what was the purpose of the cross-examination and he had said: "To show that The Denver Post had brought the defendant from Westminster, British Columbia." After counsel had announced this purpose in the cross-examination, the court stopped the cross-examination upon that line, saying that the state had never denied that The Denver Post had paid the expense of the arrest and return of the defendant. The fact thus sought to be elicited had already been testified to by the state's witnesses. It was an admitted fact in the case and certainly no prejudice was sustained by the ruling or action of the court complained of.

6. Dr. F. K. Dabney was a witness who testified that two fingers of the right hand of defendant

were in a contused condition the morning after the murder, and that such condition was as if the fingers had been bitten. When this witness was being cross-examined he was interrogated as to whether he had inquired of the patient as to the cause of the injured condition of defendant's hand. Counsel for the people, on re-direct examination, asked the doctor why he had not made such inquiries. The doctor replied: ''I was called upon about two years before that—some years before that—to dress a gunshot wound for a man and I began to inquire into the matter as to how he received this wound. He says, 'Doctor, it is none of your business; I am here to get it dressed and I am willing to pay you for your services.' From that time I do not remember any suspicious characters, and that is the reason I did not ask him.'' It was proper, on cross-examination, to ask the question that the defense did. It was equally proper, on re-direct examination, for the state to elicit the reason why the doctor had not made inquiry as to the cause of the wound under treatment.

7. This colloquy occurred between the witness last mentioned and Mr. Finn, counsel for the defense:

''Q. Then you talked with me doctor, in the jail that afternoon, did you not?

A. I have no recollection of saying a word to you in the jail that Sunday or at any other place.

Q. Or at any other place?

A. At any other place or time.

The Court: What difference does it make, Mr. Finn, whether he did or not?

Q. Did you talk with me that afternoon, doctor —that Sunday afternoon?

Objected to by counsel for the people.

The Court: It will be sustained; do not ask it again.''

It is said that the court erred in sustaining this objection. It has not been suggested to us, nor can we see how error was committed in the ruling. The witness had immediately before answered the question which was repeated and the objection to which was sustained. Nor do we see in this action of the court any indication of ill-will on its part to counsel or his client.

8. Mr. Finn, counsel for defendant, took the witness stand and was examined by associate counsel. In the course of the examination the following transpired:

"Q. Do you recollect that on or about the first day of September, 1903, Dr. F. K. Dabney called at the county jail while you were there interviewing Mr. Boles and asked you for the privilege of seeing Mr. Boles for the purpose of identification?

Objected to by counsel for people. Objection sustained, to which ruling of the court defendant, by his counsel, then and there duly excepted.

The Court: I suppose these questions are asked for the purpose of impeaching Dr. Dabney?

Mr. Belford: The purpose of these questions is to show that Dr. Dabney made an examination here (pointing toward the county jail) and had an opportunity to see Mr. Boles and did see him.

The Court: The objection will be sustained."

Suppose the witness had answered yes to the questions propounded; it would have contradicted the witness Dabney as to a purely immaterial matter. This is not permitted. Further, a proper foundation was not laid on cross-examination for this specific question. There are no suggestions as to what was the purpose of this line of examination, except as contained in the statement above quoted, made by Mr. Belford of counsel for defendant. The witness had already testified that at that time and

place he had seen Boles and had then recognized him as the man whose fingers· he had dressed the morning after the murder.   There was therefore already before the jury the matter sought to be elicited, from the witness.   No error was committed in prohibiting its repetition.

The following colloquy took place at the time of the examination of the chief of police.   The state asked him on cross-examination:

"Q.   Chief, the description you had got from this girl that night was obtained through leading questions?   She wasn't able to talk of her own volition and readily?

A.   I cannot say that it was.   I simply went into the room and asked her to give me as near as possible a description of the man who had perpetrated this crime, and, as I have related here, that is as near as I can remember as to just what was said and the description she gave me.

Q.   But, chief, you have said that the description was drawn out by you by questions on your part and on the part of the sister?

A.   I have not said it that way.   She did not give it right off-hand, but what she said was of her own volition.

Q.   Was that in answer to certain questions propounded by either you or her sister?

A.   I cannot remember just what questions I asked her nor what questions I put to her.

Q.   I will ask you if her sister·and her mother did not inform you as to what they had learned from Florence·as to the description of this assailant before you had got—what they had been able to discover?

Objected to by counsel for the defendant.   Objection overruled, to which ruling of the court defendant, by counsel, then and there duly excepted.

A. The description that I got and telephoned in to the police station, I got it from Miss Florence Fridborn herself.''

The point is made that error was committed in overruling this objection. It is not pointed out to us why, and we are unable to see any prejudicial error in the ruling. Counsel for the state was perhaps attempting to develop the fact that the mother and sister had given the statement describing the defendant which the chief had telephoned in to headquarters, and thus account for any seeming discrepancy between the description then given of the defendant and that subsequently given by Florence. The witness, however, testified that he got the description then obtained from Florence herself. No prejudice could have resulted from the ruling.

10. The assaulted girl testified that she had left her skates in the mud at the place where the murder was committed and that they were unstrapped at the time. When the skates were found they were strapped together. Much stress is laid upon this seeming contradiction. She may have been mistaken as to the condition in which the skates were left, or some one may have picked them up and strapped them together before they were found by one of the witnesses, Mr. Collier. At any rate, it was a matter which went to the credibility of the witness which was for the consideration of the jury.

This same witness testified that her cape and cap were gone when she reached home. She knew nothing as to what became of them. Her cloak was found in a folded condition with her cap lying on it near the scene of the murder. What explanation there is as to their being found in this condition the evidence does not suggest. Counsel for defendant contends that it goes in support of his theory that she had a paramour and that the murder was com-

mitted by such associate. As we have heretofore stated, this theory is unreasonable and in direct conflict with the undoubted facts of the case.

There is some discussion as to the conflicting evidence in respect to the gold ring. This was a matter for the consideration of the jury.

After a careful consideration of the record in this case, we conclude that the evidence abundantly supports the findings of the jury, and this being true, in the absence of error in the law committed during the progress of the trial, we should leave the verdict and sentence undisturbed.

We have met no error in the rulings of the court. It is not even complained that there was error in the charge under which the case was submitted to the jury. We conclude that the defendant had a fair trial, therefore that its result should not be disturbed.

Judgment affirmed.                    *Affirmed.*

CHIEF JUSTICE GABBERT and Mr. JUSTICE MAXWELL concur.