## No. 13,578.

PRUDENTIAL INSURANCE COMPANY OF AMERICA *v.* CLINE, EXECUTOR.
(57 P. [2d] 1205)

Decided January 27, 1936. Rehearing denied March 30, 1936.

Messrs. BENEDICT & PHELPS, for plaintiff in error.

Mr. FOSTER CLINE, pro se.

*En Banc.*

MR. JUSTICE BUTLER delivered the opinion of the court.

ERNEST H. Bjorkman sued the Prudential Life Insurance Company of America, hereinafter called the defendant, on a policy of insurance and obtained judgment for $1,036.26, being the face of the policy with interest. The defendant sued out this writ of error, seeking a reversal of the judgment. While the case was pending in this court Bjorkman died, and Foster Cline, as executor of his estate, was substituted as defendant in error.

On January 18, 1933, the defendant insured the life of Agnes L. Bjorkman for $1,000 for the benefit of her husband, Ernest H. Bjorkman. The insured died within the year, to wit, on October 18, 1933. Upon the refusal of the defendant to pay the amount of the policy, Bjorkman sued. So far as pertinent here, he alleged the issuance of the policy and the death of the insured. The answer admitted the issuance of the policy and the death of the insured; but, as an affirmative defense, pleaded that the policy provided that "if within one year from the date hereof the Insured, whether sane or insane, shall die by suicide, the liability of the Company shall not exceed the amount of the premiums paid on this policy"; that within the year the insured committed suicide; and that the amount of premiums paid was $37.14, which the defendant tendered to the plaintiff. The replication denied that the insured committed suicide.

The plaintiff proved the allegations of his complaint, whereupon the defendant undertook to establish its affirmative defense of suicide. The court correctly instructed the jury, in substance, that the defendant had the burden of proving that the insured committed suicide, and if the jury found from a preponderance of the evidence that the insured died by suicide, their verdict

should be for the defendant; otherwise, their verdict should be for the plaintiff. The verdict for the plaintiff for the full amount of the policy means that the jury found that the defendant did not prove by a preponderance of the evidence that the insured committed suicide. The defendant contends that that finding was wrong, and that the court erred in not directing a verdict for the defendant.

The court gave the following instruction: "Suicide must be proven, and if you can reconcile the facts of this case upon any reasonable hypothesis, based upon the evidence, that death of the insured was not caused by suicide, it is your duty to do so." As the defendant made no objection to the instruction, it became the law of the case. Supreme Court rule No. 7. Its correctness is not challenged at this time. Was the evidence such as to exclude all reasonable hypotheses other than that of suicide? If so, was such evidence so clear as to make it the duty of the trial court to take the case from the jury and direct a verdict for the defendant? If these two questions require an affirmative answer, the judgment should be reversed; otherwise, the judgment should be affirmed. After a careful consideration of the evidence, we conclude that the questions should be answered in the negative.

The general and natural presumption is against suicide. *Hershey v. Agnew,* 83 Colo. 89, 262 Pac. 526.

Alfred M. Du Bois, a witness for the defendant, testified on direct examination that he had known Mrs. Bjorkman a long time; that on the night of October 18, 1933, he saw her coming out of the Myers drug store, at Eighth and Santa Fe in Denver; that he had gone there in his car to meet her; that she walked up to his car with a cup in her hand and drank the contents of the cup, saying "I have done it"; that he asked what she drank, and she answered, "Black Leaf 40" (which, the evidence shows, was a deadly poison); that she then dropped the cup; that he put her in the car and took her to the General

Hospital (a few blocks away); that she was very sick, gagging "like she wanted to throw up"; that she died within a few minutes after being admitted to the hospital; and that the cup was found when he went back with the officers.

On cross-examination, he testified as follows: "Q. As she approached there, standing in front of you and you were outside the car, who spoke first? A. I didn't say a word. Q. What did she say? A. 'I have done it.' Q. I have done it? A. Uh, huh. Q. Then did she drink the contents of the cup, or before? A. After. Q. Did she drink the contents afterwards or before she said that? A. After she drank it. Q. That is, as she stood right in front of you she drank the contents and then said 'I have done it'? A. Yes, sir. Q. That is all she said? A. That is all she said. Q. What did you say? A. I said 'What did you take' and she told me Black Leaf 40. * * * The only thing was said was the remark she made. Q. Did she make any further remark that evening in the car? A. No. Q. Not a word? A. No. Q. All she said was 'I have done it'? A. Yes. Q. That is not all she said, was it? A. That is all she said. Q. I thought you said awhile ago she said 'I took Black Leaf 40.' A. She did, to start with. I asked what she took and she said 'I took Black Leaf 40.' " Later on he testified: "Q. And on that same occasion didn't you tell these two investigators that as Mrs. Bjorkman approached the car you asked her what she had in the cup and she replied 'Coca Cola and aspirin'? A. Yes, that is right. Q. So you didn't relate all the conversation awhile ago, did you? A. Maybe I didn't. Q. Why didn't you? A. I don't know. I am a witness here and maybe I overlooked it." He also testified that he and Mrs. Bjorkman were very good friends; that he met her first while he was working for her husband; that he never wrote her any letters; that they never kept company; that he went to the World's Fair and saw her there; that he supposed they went on the same train, but did not go there to-

gether; that he refuses to say whether they came back on the same train; that she never intimated to him that she was in a family way; that he never offered to help her in any way; that he wrote the note marked Exhibit I; that on the day of her death she telephoned asking him to come to Eighth and Santa Fe to get her; that he "imagines" she held the cup in her right hand, but is not sure; that he is a drinking man, but was not drinking that night; that he did not know that she was intoxicated at that time, could not truthfully say she was not, she might have been; that she did not vomit on the way to the hospital; that he had seen her intoxicated, but could not tell how many times; that he did not know she had a diamond ring.

Officer Wilson testified that he and officer Niles took Du Bois from the hospital to Eighth and Santa Fe and found a cup in the gutter; that there had been some dark colored liquid in it, but no analysis ever was made of the contents; that upon being questioned, Du Bois stated that Mrs. Bjorkman first told him she had taken aspirin and Coca Cola and began to vomit afterward, and later made a statement that she had taken Black Leaf 40; that Du Bois had been drinking; that there was "vomit all over the car." He also testified that the plaintiff told witness that Mrs. Bjorkman had done, or attempted to do, the same thing two years before by taking Black Leaf 40, but did not say that he had seen her take it. The plaintiff denied making such statement. Officer Niles gave substantially the same testimony as did Wilson.

Edgar A. Lawver, a druggist and registered pharmacist employed at the Myers drug store at Eighth and Santa Fe, testified that shortly after six o'clock on the evening of October 18 he sold one ounce of Black Leaf 40 to a woman; that it is an insecticide; that the woman said she wanted it to kill lice on her plants; that he has a "vague impression" that the woman was dressed in dark clothes; that he could not at all recognize Mrs. Bjorkman's picture, which was shown to him; that the woman

to whom he made the sale was about 5 feet 6 or 7, did not appear tall; that he does not think she had on a red dress; that he told the investigator that he thought the woman he sold to was dressed in dark clothes; that his best recollection is that she did not have on a red dress; that a little more than a week later he saw Mrs. Bjorkman's picture and said he could not remember that was the woman; that he made but one sale of Black Leaf 40 that evening; that they are permitted to sell it without a doctor's prescription—do not even have to register the sale.

The defendant introduced in evidence a copy of the death certificate certified by S. R. McKelvey, state registrar of vital statistics, in which suicide is given as the cause of death. The original death certificate, filed with the registrar, was signed by Deputy Coroner Bostwick.

In rebuttal the plaintiff called several witnesses. The plaintiff testified that his wife's dress was the same color as her jacket, same degree of red; that his wife was 5 feet and 5 inches tall.

Paul Nord, a druggist then in the employ of a drug store across the street from the Myers store, testified that between six and seven o'clock on the evening in question a woman wanted to buy some paper cups; that they had none for sale, but he gave her a cup from the fountain; that he does not think that Exhibit H (a photograph of Mrs. Bjorkman) is a picture of the woman; that he could not say exactly how the woman was dressed, only she had dark clothes on; that he was behind the counter; that what he saw of her was black; that he did not pay any particular attention to the appearance of the woman.

Deputy Coroner Bostwick testified that the statement in the death certificate signed by him was not based on personal examination, or upon anything told him by the plaintiff; that no autopsy was performed; and that the witness thinks O'Brien investigated the case.

J. P. Deveraux, a restaurant manager at 760 Santa Fe

Drive, testified that Mrs. Bjorkman came to his restaurant with Du Bois frequently—on an average of once or twice a week; that she was there alone on October 18 at about two o'clock in the afternoon; that she was intoxicated, caused a disturbance of all kinds and threw her shoes; that he ejected her from the place three times that day; that the last time she was there was between five and six o'clock; that her condition then was worse; that she was intoxicated beyond the point of being responsible; that she abused the customers, would fight and do everything she possibly could to be an annoyance and a detriment to the business; that she was not in possession of her normal faculties; that she requested liquor, and he refused to let her have any; that she went out and returned with a bottle of whiskey; that she was inebriated, weaved from one side to the other, and he put her out.

Mary Murphy testified that she saw Mrs. Bjorkman at about half past three in the afternoon of the day she died; that she was either sick or drunk, was unable to walk, and was going to fall; that she left witness at four or four fifteen; that she had on a red dress and black jacket; that her skirt was the color of Exhibit K. That exhibit is before us. It is Mrs. Bjorkman's jacket, in color a flaming light red.

Peter S. Murphy testified that at four o'clock on the day in question he saw Mrs. Bjorkman; that she was intoxicated, was staggering and noisy; that she wanted to go home; that witness wanted to take her home, but she said that she would telephone her nephew to take her home; that witness gave her a nickel to enable her to phone.

Mrs. Alice Culp testified that she saw Mrs. Bjorkman at noon on October 18; that she was standing on the sidewalk, seeming to be waiting for somebody; that she told witness she was paralyzed; that between four and five o'clock the same day witness saw Mrs. Bjorkman again; that Mrs. Bjorkman was weaving back and forth; that

she had something white that looked like a bottle of milk in her hand, was holding it aloft in the air and screaming at the top of her voice; that Mrs. Bjorkman went into the back door of 901 Acoma and down in the basement, and witness saw her no more.

Counsel for plaintiff offered in evidence Exhibit I, a letter admittedly written by Du Bois. It was offered for the purpose of contradicting his testimony that he never wrote to the insured and never offered to help her. It clearly had that tendency, but it was not admitted in evidence. Dr. Bjorkman was 74 years old; his wife, 38; Du Bois, 34. Such was the evidence in the case.

Considering the record, was it the duty of the trial court to direct a verdict for the defendant? Do the evidence and the inferences reasonably to be drawn therefrom lead to only one conclusion; namely, that the insured committed suicide? Do they reasonably exclude the hypothesis that death resulted from some cause other than suicide; for example, that if the insured took poison, she did so accidentally and not for the purpose of taking her life? The burden rested upon the defendant to prove suicide, not upon the plaintiff to prove some other cause; for instance, the accidental taking of poison.

Though the certified copy of the death certificate was prima facie evidence of suicide, its weight depends, of course, upon the information upon which the certificate was based, the source of that information, and the manner in which it was obtained.

The woman who purchased the insecticide said it was to kill plant lice. She was dressed, not in flaming red, as Mrs. Bjorkman was dressed, but in dark clothes, according to Lawver's recollection. Shown Mrs. Bjorkman's picture about a week after he sold the insecticide, Lawver told the investigator he could not remember that that was the woman who bought, and on the witness stand he was shown the picture again, and said he "could not recognize it at all." If Mrs. Bjorkman—drunken, staggering, noisy—was the woman who purchased the insecti-

cide, which, as we have seen, is a deadly poison, Lawver could not have failed to observe her condition and would not have failed to mention her condition when he described the woman to whom he sold the poison; and yet there is not a word in his testimony that even hints at any such condition in the woman who bought the poison. It is inconceivable—and no doubt the jury so considered it—that a druggist and registered pharmacist sold a deadly poison to a person in Mrs. Bjorkman's condition.

The woman to whom Druggist Nord gave a drinking cup wore dark clothes. Being shown Mrs. Bjorkman's photograph, Nord testified that he did not think it was a picture of the woman to whom he gave the cup.

The bottle that contained the liquid was not found. No autopsy was held, and there was no analysis of the cup or of such part of the liquid as remained in it.

What weight could be given to the testimony of Du Bois? The testimony of disinterested witnesses was to the effect that when the officers saw him at the hospital at the time of Mrs. Bjorkman's death Du Bois had been drinking. At the trial his answers were such as to justify the inference that he was under the influence of intoxicating liquor while testifying, and his conduct and demeanor were such as to cause the court to caution him thus: "The court: Now, here, you don't want to go to jail, do you? Witness: Well, I don't mind, Judge. The court: Well, you will in a minute if you keep on. You will spend some time in jail if you are not going to behave." His testimony with reference to what Mrs. Bjorkman said when she had the cup in her hand was self-contradictory, and the trial court said when denying plaintiff's motion for a new trial, and no doubt the jury found at the trial, that he misled, or attempted to mislead, the court and the jury with reference thereto.

The jury, in considering the weight to be given to the testimony of Du Bois, had a right, and it was their duty, to take into consideration his condition as to

sobriety or otherwise at the time he conversed with Mrs. Bjorkman just before her death, as bearing upon his ability to understand clearly what she said to him; the inconsistency of his testimony; the fact that his testimony in important particulars was contradicted by other witnesses; and his manner and demeanor upon the witness stand; and if, upon considering all the evidence, the jury found that he had willfully and corruptly testified falsely to any fact material to the issues in the case—and the record shows that there was evidence justifying such a finding—they had a right to disregard the whole or any part of his testimony.

But even if the testimony of Du Bois were entitled to full credit, it does not exclude the reasonable hypothesis of accident. Assuming that Mrs. Bjorkman drank the insecticide, it is a justifiable inference from the testimony that this drunken, staggering woman drank it under the impression that it was aspirin and coca cola as she first told Du Bois it was, and then, feeling the sudden effect of the deadly poison, realized the terrible mistake that she had made and thereupon told Du Bois that it was Black Leaf 40 instead of coca cola, whereupon he rushed her to the hospital. This is consistent with the testimony of Du Bois, assuming that Du Bois was in condition to understand what was said, and that he was in condition to repeat it accurately at the trial and disposed to do so.

■ ■ Considering all the circumstances, the trial court did not err in refusing the defendant's request to take the case from the jury and direct a verdict for the defendant. The case was for the jury, and their finding, approved as it was by the trial court, should not and will not be disturbed by us.

There are other assignments of error, but they are wholly without merit and need not be discussed in this opinion. We find no reversible error in the record. The judgment is affirmed.

Mr. Justice Bouck dissents.

The following dissenting opinion was filed June 1, 1936, being the final revision of the dissenting opinion filed January 27, 1936.

MR. JUSTICE BOUCK, dissenting.

Bjorkman, the husband of the insured, was plaintiff below, and recovered judgment for the face of a life insurance policy. He has since followed his wife in death. The administrator of his estate has been substituted for him as defendant in error. I shall, however, refer to Bjorkman as if he himself were still the defendant in error here.

The plaintiff in error insurance company, defendant below, duly executed and delivered the policy in question.

The only issue in the case was whether Mrs. Bjorkman, the insured, committed suicide within the meaning of the insurance contract. If she did, the insurance company was liable, under the policy sued on, for no more than the amount of the premiums paid and accrued interest (which premiums and interest are conceded to have been tendered to the plaintiff); if she did not, the defendant was liable for the face of the policy. The majority opinion upholds the judgment of the lower court, which is necessarily based upon the proposition that Mrs. Bjorkman did not commit suicide within the proper interpretation of the policy. I am unable to concur in this view.

The police power of the state of Colorado is not involved. Section 2532 of Compiled Laws 1921, which prohibited insurance companies from interposing the defense of suicide, expressly limited itself to the period subsequent to the first policy year, as do the amendatory acts of 1933 and 1935. Mrs. Bjorkman's death occurred before the first year had elapsed. Consequently our judicial task is simply to ascertain and enforce the meaning of the contract contained in the policy. The latter says: "If within one year from the date hereof the Insured, whether sane or insane, shall die by suicide, the liability of the Company shall not exceed the amount of the pre-

miums paid on this policy." The quoted words seem to be plain and unambiguous, and require no construction.

In view of its context, the word "suicide" in the above provision of the policy must necessarily be taken to signify "self-killing." And according to a familiar rule of interpretation the words "sane or insane" must be given their natural and ordinary meaning. The evident purpose was to make self-destruction during the first year an absolute defense. Regardless of how much mind the insured had, *and even if the insured were totally insane,* death by some act of the insured defeats recovery of the face of the policy. "The numerical weight of authority supports the view that the applicability of a suicide clause with the words, 'sane or insane,' is not dependent upon the insured's consciousness or realization of the physical nature or consequences of his act, or his conscious purpose to kill himself, and that the provision in that form applies, assuming that the act of self-destruction would be regarded as suicide in the case of a sane person, regardless of whether the insured realized, or was capable of realizing, that his act would kill him, or of entertaining an intention to kill himself." 6 Couch, Encycl. of Ins. Law, page 4640, section 1262e. See note 12, at page 4641, citing cases from the federal courts and from many other jurisdictions. A small minority line, almost wholly limited to Kentucky, seems to hold the contrary, obviously against the principles and practice applying to the interpretation of written documents.

A good statement of the actual development in this field of law to the present is given in the case of *Scherar v. Prudential Ins. Co.,* 63 Neb. 530, 533, 88 N. W. 687, 688, as follows:

"The important question presented by the record, is the construction to be given to the clause avoiding the policy if the insured should die by suicide, sane or insane. It is the duty of the court to ascertain from the contract, if possible, what the parties meant by it, and, when so ascertained, to give effect to it. The intention

of the parties in incorporating into the contract the pro-
viso that it should be void if, within three years from
date thereof, the insured should die by suicide, sane or
insane, seems to us so manifest that an explanation of its
meaning seems hardly necessary. The language employed
is plain, simple and concise, and, when given its common
and ordinary meaning, is not likely to be misunderstood.
Under the terms of this policy it was clearly the inten-
tion of the parties to protect the insurer from liability,
except to the amount of the premiums paid, for any self-
destruction by the insured, *no matter what the mental
condition of the insured might be at the time the act was
committed.* It was entirely immaterial whether the
insured was mildly or violently insane, or whether her
malady was of such a character that she was unconscious
of the moral and physical nature of the act. No kind or
degree of insanity will prevent an avoidance under such
a contract where the assured commits the act of self-
destruction. *There is no reason why the insurer may not
by stipulation contract that the liability shall not extend
to acts of self-destruction committed while the insured is
sane or while he is insane, the same as the insurer may
contract that the liability shall not extend to hazardous
occupations, residence within the tropics, death in a duel,
or the like.* The insurer evidently was unwilling to incur
the perils of insanity, and the clause exempting it from
liability was inserted to protect it against that hazard.
It is well settled by; a long line of decisions in this coun-
try that *under the old forms of life insurance policies* in
which it is provided that the insurer should not be liable
if the insured committed 'suicide' or 'died by his own
hand,' the policy was not avoided when the insured com-
mitted suicide while insane, the basis of the reasoning
being that it was not within the contemplation of the
parties that the policy should be avoided if the insured
was insane at the time of the suicide. * * * In view of the
decisions of the courts, and *apparently to meet the effect
of them,* companies began to insert in their policies such

words as are used in this policy, or words equivalent thereto, as 'suicide, sane or insane,' 'die by his own hand, sane or insane,' and other like expressions.'' (Italics are mine.)

This Nebraska case, moreover, cites in support of its decision numerous authorities, including the United States Supreme Court and the courts of New York, Iowa, Vermont, North Carolina, Pennsylvania, Michigan, Texas, Kansas, Ohio and Missouri. Since 1902, when the Nebraska case was decided, corroborative holdings have multiplied in many jurisdictions. I shall not take the time here to cite any of these cumulative decisions.

The defense of suicide in such a case as this is of course an affirmative one, and *the initial burden of proof was undoubtedly on the defendant company.* That burden, in my opinion, was fully sustained by the company and was never met or weakened by the plaintiff. I say this for two reasons. First, the General Assembly of Colorado created in the year 1907 an affirmative presumption which, as applied to the facts in the case at bar, constituted prima facie proof of the company's defense. Secondly, the evidence adduced has failed to overcome this mandatory presumption of the statute. These I shall discuss in order.

I. *Colorado's Statute as to Prima Facie Proof of Suicide.*

A Colorado statute makes it the duty of the state registrar of vital statistics to furnish certified copies of the record of any birth or death registered in his office, and provides: *"any such copy of the record of a birth or death, when properly certified by the state registrar to be a true copy thereof, shall be prima facie evidence in all courts and places of the facts therein stated."* C. L. 1921, section 990.

Pursuant to this provision the defense of suicide *and the manner of it* were prima facie established; for there was in evidence the official certificate executed according to law by the ex officio coroner of the city and county of

Denver, through his deputy, as to Mrs. Bjorkman's death, and duly registered as the law requires, the certificate being in the form of a copy, duly certified, in exact compliance with the statute, by the state registrar of vital statistics. The coroner said: *"I hereby certifiy that * * * the principal cause of death and related causes of importance were as follows: Black Leaf 40."* The coroner's certificate likewise contained this:

*"If death was due to external causes (violence) fill in also the following: Accident, suicide, or homicide? Suicide."*

It will be noted that the *facts* stated in the certificate included not only death by suicide, *but also the cause of death as "Black Leaf 40."*

The certificate, then, by sheer force of the statute, *was prima facie proof*—in other words, *created a presumption*—that Mrs. Bjorkman committed suicide *with the poison mentioned.*

Mere supposition or suspicion could not overcome such a positive statutory presumption. Unless the record discloses competent and substantial legal evidence which contradicts the facts that are presumed in obedience to the legislative enactment, the validity of which was not in any way assailed by the plaintiff, the trial court ought to have directed a verdict in favor of the defendant.

Was there such legal evidence?

I think not. Nothing adduced by the plaintiff Bjorkman rises above the level of bare suspicion or wild speculation. An analysis of the evidence, as I read it, shows a total lack of evidence legally capable even of casting a reasonable doubt upon the facts which under the statute are *prima facie true.* Some of the evidence will accordingly be considered in more or less detail.

II. *The Evidence Fails to Overcome the Company's Prima Facie Proof.*

The first question of evidence confronting us concerns the death certificate itself. The majority opinion says: "Though the certified copy of the death certificate was

prima facie evidence of suicide, its weight depends, of course, upon the information upon which the certificate was based, the source of that information, and the manner in which it was obtained.'' The fallacy here is in overlooking that the legislature has attached to the particular document as such a specific significance wholly regardless of the ''information,'' its ''source,'' and the ''manner'' of its procurement. The legislature clearly intended that the *facts* contained in it are to be taken as *true* until these facts are overcome by substantial evidence to the contrary. That the state registrar or the coroner had no personal knowledge of those facts is beside the question. There is no *''weight''* to be considered. The prima facie value of the certificate is fixed by law without qualification. The customary presumption of honesty and regularity in official conduct is not limited in the case of a state registrar or a coroner to such acts as are performed personally by the officer. The protection of that presumption would be poor indeed if, amidst our modern governmental complexities, it did not extend to all acts performed under the supervision, or by the authority, or in the department, of a public officer, not merely those personally performed by himself. Were it otherwise, the presumption would be worthless. To discard an official certificate because the proper certifying officer obtained the certified facts through a deputy or other employee under him would repeal the statute whenever the volume or nature of official business requires a subordinate of the principal officer to act. This is unthinkable. The failure to give the effect demanded by the statute is, I think, a cardinal error.

Other evidence referred to in the majority opinion, for the apparent purpose of justifying the refusal of the lower court to direct a verdict in favor of the insurance company, is as follows: (1) According to the testimony of several witnesses, Mrs. Bjorkman was intoxicated on the day of her death; (2) according to the witness Du Bois, testifying on direct examination, Mrs. Bjorkman

came toward him holding a paper cup, stopped a few feet from him, drank the contents and said: "I've done it," and *when he asked what she had taken she said "Black Leaf 40,"* whereas on cross-examination he testified that *he had not stated all that was said* and that, when he asked what she had in the cup which she was holding as she was approaching him before she drank, she answered: "Coca-Cola and aspirin"; (3) *Du Bois stated to another witness and also on the witness stand that Mrs. Bjork-man did not vomit on the way to the hospital, but merely gagged;* (4) Du Bois stated that he "never offered to help her in any way"; (5) *Du Bois admitted that he wrote the note marked Exhibit I;* (6) Du Bois testified that she never told him or intimated that she was in a family way; (7) Du Bois testified that he went to the World's Fair at Chicago and saw her there, that he supposed they went on the same train, but that they did not go there together; (8) Du Bois and Mrs. Bjorkman were very good friends; (9) *they never kept company;* (10) that she phoned him shortly before her death to come and get her at 8th and Santa Fe; (11) *Du Bois testified that he did not know Mrs. Bjorkman had a diamond ring;* (12) certain other evidence that I shall mention and discuss either incidentally with the above eleven points or separately later on.

Point (1) as to Mrs. Bjorkman's intoxication disposes of itself. This, in view of the prima facie proof of suicide under the registration statute, has no more bearing on the main issue than would evidence as to insanity, a subject already discussed. On the contrary, the intoxication testified to discloses a positive trait of firmly intending and promptly accomplishing; for example, in demanding whiskey of a witness and, when refused, procuring it herself; and, again, in refusing an offer to take her home, and doing her own telephoning to make a different arrangement by asking Du Bois to call for her at a specified place, an arrangement duly carried out. Another witness tells of Mrs. Bjorkman's seeming so

drunk as to be unable to walk and, in the same breath, of her suddenly walking away unassisted. All this evidence clearly indicates deliberate intention and will power on the part of Mrs. Bjorkman. It excludes all likelihood or possibility of her taking Black Leaf 40 *by mistake* for something else, as is suggested. No evidential foundation whatever is laid for inferring such a mistake.

Point (2) involves an apparent inconsistency which disappears upon reading the quoted testimony in its entire context. All that Du Bois said in that connection bears the earmarks of truth, and, when so read, is wholly free from inconsistency.

Point (3) is palpably immaterial. Whichever it was, vomiting or gagging, the condition fits perfectly into the insurance company's defense, in the light of Dr. Dennis's uncontradicted testimony as to how Black Leaf 40 operates. His was the only evidence on the subject.

Points (4) and (5) emphasize the vice of certain lines of cross-examination forbidden by our own decisions. The matter involved was collateral, not in any way connected up with the main issue. To introduce evidence contradicting Du Bois's answer would have been prejudicial error even if it had refuted the latter. Exhibit I, concerning the exclusion of which the jurors could not help speculating to the disadvantage of the insurance company, seemed upon his mere inspection so manifestly inapposite to the trial judge that he himself ruled it out. That he was right is apparent from the exhibit, which speaks for itself: "Agnes: My mind is clear now. You picked your friends so I guess you had better stick by them. I'll pick mine and do the same. You say you have some trouble coming up. If it happens I'll try and be in a position to help you. Please don't phone or come up as it only causes trouble. You ought to quit drinking. Be good. Al."

Point (6) illustrates the plaintiff's regrettable, persistent and frequently successful efforts to introduce totally improper collateral matters which must have

strongly tended to prejudice the jurors against the witness Du Bois, and indirectly against the insurance company. These matters included wholly irrelevant insinuations and innuendoes against Du Bois's character, coupled with repeated announcements by counsel that they were offered to show for instance "his motive and his interest," and "a motive why this man wanted Agnes Bjorkman out of the way and why he comes in with the story that he has," and "that it is just as reasonable a hypothesis, based on this man's conduct, *that he himself wanted to get rid of Agnes Bjorkman*; that she had told him she was in trouble; that he had written letters to her about it; that he had been intimate with her; they had been together for hours before on this day." Of most of the scandalous matters there is neither direct nor circumstantial evidence. "And when he writes a letter to her he says 'I will help you,' and now he says he never made any such statement. He has admitted this is his document." Again: "And if I am permitted to cross-examine this witness, I will show a course of conduct on the part of this man by his verbal and written statements that shows a reason why that woman died just as consistent as suicide, and I will discredit this man before I get through so that the jury won't believe his statement that she said 'I took Black Leaf 40.' It is for the purpose of impeaching him." All this in presence and hearing of the jury. After the overruling of many appropriate objections by opposing counsel, the trial judge finally entertained an objection at this juncture, and a motion to strike out the objectionable remarks. Plaintiff's counsel said: *"I have no objection."* The Court: "All right, gentlemen of the jury, you will disregard the remarks of the attorney as to the matters he dictated." Counsel: "But I still insist I should have a right in view of the circumstances to thoroughly cross-examine him, *not as to substantive facts, but to show his interest, his bias and prejudice and the probability of his testimony or the improbability of it.* * * * Now, [defendant's counsel]

says we must offer something substantive. I have shown certain facts. [Du Bois] *has absolutely contradicted the relation which he admits in his own handwriting.* * * * I asked whether he promised to help this woman and he said never, under any circumstances, for anything, and there is his writing." The "writing" was Exhibit I, mentioned under points (4) and (5), which had long before been—all too tardily—excluded by the court. How upon such a record the jurors could have acted without the rankest prejudice to the defendant, I cannot imagine.

Point (7) introduces Du Bois's visit to Chicago and his seeing Mrs. Bjorkman there, but the testimony is devoid of any suggestion that it is, or can be made, relevant to the issue. What is said above under point (6) illustrates the lack of probative quality. Here too the inevitable prejudice resulting is apparent.

Points (8) and (9) are but mild illustrations of the continuous bombardment to get into the record collateral matters, which did not always bear the same innocent form. It frequently branched into subjects frankly tending to assail in a perfectly roundabout way *the reputation of the witness Du Bois,* not for veracity but for wholly different moral traits.

Point (10), through the testimony of one of the plaintiff's own witnesses, directly corroborates Du Bois's evidence. This was further corroborated by Horkans, *an "impeaching" witness of the plaintiff.*

Point (11) concerns a diamond ring, foreign to the direct examination of Du Bois, and is not even indirectly brought within the reasonable scope of cross-examination. Over strenuous objection the lower court admitted the testimony upon counsel's plea *that he wanted "to show this man had that diamond ring and what he did with it."* "Motive, bias, interest"! "Laying the foundation for impeachment"! It is hard to conceive how this questioning could have been deemed admissible under accepted rules of evidence. Aligning that evidence with

the issue ''suicide or no suicide'' would, I believe, be a rather difficult feat.

The majority opinion asks, ''What weight could be given to the testimony of Du Bois?'' and concludes that this witness deserves no credence. The immateriality of the question is manifest when we consider that, as a matter of cold fact appearing from the record, the testimony of Du Bois could easily be discarded without affecting the case one way or the other. He, of course, is in no sense a party. The fallacy as to the importance of his testimony runs parallel with the cardinal fallacy already dealt with, namely, *the failure of the court to give to the death certificate the effect prescribed by the duly enacted statute.* If Du Bois were believed, he would merely strengthen the prima facie proof of the statutory presumption. If, on the other hand, he were disbelieved, it would be immaterial; for an unsuccessful effort to provide independent corroborative proof of some of the facts which under the statutory presumption are already taken as true could neither nullify nor weaken the prima facie proof itself. The benefit of the presumption would not be forfeited by the insurance company's possibly futile endeavor to ''make assurance doubly sure.'' If it were, the industrious attorney taking the precaution to present all the evidence he could muster in the trial court would suffer a strange and unjust penalty indeed. I know of no such practice.

A number of points are also attempted to be made in the opinion which are intended to weaken the evidence by referring to testimony that *certain things were not done.* For example, ''no analysis ever was made of the contents [of the paper cup]'' and ''no autopsy was performed.''

But the official investigations were made, and official conclusions were announced. It must be remembered that no representative of the insurance company was present at or after the tragedy to collect evidence in support of the presumption of suicide. The very fact

that an insurance company does not learn of a death until some time thereafter, when existing evidence has usually disappeared, supplies a plausible reason for the creation by the legislature of the statutory presumption as a practical means of advancing the truth. He who assails this presumption is usually one vitally interested, as was Bjorkman here, in ascertaining all available facts and circumstances in a suicide case, and in establishing if possible the fact of accident or absence of suicide. Bjorkman made no attempt to preserve evidence. It was within his power to demand an autopsy or have his wife's stomach contents tested; he did neither. It was within his power to ask for the preservation of the paper cup, and for analysis of the liquid residue; he did not do so. Cup and contents had been lost before the company was notified of the death. Similarly Bjorkman and his counsel had ample opportunity of turning up *affirmative evidence,* if any was available, to overcome the statutory presumption which under the statute constituted a complete prima facie defense for the insurance company. Instead of supplying such affirmative evidence, however, Bjorkman actually is said by disinterested witnesses— the investigating officers—to have stated to them *during the official investigation* that Mrs. Bjorkman had *tried two years before to commit suicide by swallowing the same poison.*

It follows, from what has been said, that, even if Du Bois's testimony were deemed entirely discredited, and even if we were to ignore all the evidence concerning the visit of some woman at two drugstores on Santa Fe avenue shortly before Mrs. Bjorkman's death, and, furthermore, if we should concede the identification of that woman as Mrs. Bjorkman to be impossible, still the statutory presumption arising from the facts set forth in the registered death certificate would be unimpaired.

But the very points attempted to be made against the identity of Mrs. Bjorkman with the woman who had the fleeting transactions in the two stores are not well taken.

The arguments are centered upon the dress, the height, and a photograph of Mrs. Bjorkman. As to *dress,* there was not a single witness who claimed to have seen Mrs. Bjorkman wear what the majority opinion calls the "flaming light red jacket" (Exhibit K) on the afternoon in question. It was produced by Bjorkman himself, who said *he obtained it some time later from the undertaker.* But he produced no other part of his wife's apparel, and the jacket was authenticated by nobody else, not even by the undertaker. That the upper part of Mrs. Bjorkman's habiliments was a *black* garment is testified to by Mrs. Murphy, one of the plaintiff's own witnesses, who described Mrs. Bjorkman as clothed in a "red dress and *black jacket.*" One of the police officers who made the investigation testified that the dead woman was clad in a "dark red dress and *black coat.*" Unquestionably if shortly prior to her death Mrs. Bjorkman wore the light *red* jacket represented by Exhibit K, it was concealed beneath a *black* jacket or coat. There is no evidence to the contrary. The two druggists were not qualified as experts on women's dress. Both emphasized that they paid no special attention to the matter and that they saw the woman across their respective drugstore counters, so that only the upper part of her was visible. That part of the clothing seemed to them to be dark; and one of them, when pressed by a positive assertion of the plaintiff's investigator that Mrs. Bjorkman wore a red dress, added: "I also said she may have had a *coat* on, but I couldn't remember." The *height* of the woman was testified by Bjorkman as 5 feet, 5 inches (in stocking feet?), by druggist Lawver as about 5 feet, 6 or 7 inches, and by druggist Nord as about 5 feet, seven or eight inches; which probably represents less than the usual amount of disagreement in eye measure by a random group of three persons, two of whom had no apparent reason to be accurate in view of the casual and brief contact with a stranger. As for the *photograph* of Mrs. Bjorkman, the fact that these two drug clerks declined to identify its

subject as the woman whom they saw for a few moments as a perfect stranger is not remarkable; it would be remarkable indeed if either of the two men had ventured such an opinion. The law has heretofore been that a photograph can be used to *explain and illustrate testimony*. See Wigmore and all the authorities on evidence. But it is a new departure to argue, as counsel here does, that non-identity may be established by the opinion, positive or negative, of one who casually meets a stranger, basing such an opinion upon an alleged photograph admittedly three or four years old. (As a matter of fact, it is common knowledge, of which courts may take judicial notice, that the photograph harks back to the era of the World War; which is confirmed by Bjorkman's own testimony that the hat appearing therein was bought by him for his wife about 1919. It was these circumstances that led me to investigate, *for my own satisfaction,* with the result that I found and interviewed in Denver the man whose studio name the picture bears. He had retired from the photographic field prior to 1923, and stated to me that this particular photograph was made *prior to 1918*. The photograph is in the record as Exhibit H and speaks for itself. Its use here for the purpose of establishing non-identity seems to me clearly lacking in legitimate evidentiary value.)

It will be noted that we thus inevitably come back to the majority opinion's cardinal fallacy of failing to give full effect under the Colorado registration statute to the presumption that suicide was committed by swallowing Black Leaf 40. These statements of the certified copy of the death certificate are required by that statute to be taken as prima facie true. Logically, the prima facie proof would not have been overcome in the slightest degree by showing that the Black Leaf 40 so used was not the Black Leaf 40 purchased at the Myer Drug Store a small fraction of an hour before Mrs. Bjorkman's almost instantaneous death, or that the woman who purchased it was not Mrs. Bjorkman herself. It would not

be at all inconsistent with the statutory presumption if the poison actually employed by Mrs. Bjorkman had been bought by somebody else or at a different place or time. The mere fact that such a purchase took place, strangest of strange coincidences as it would be, could not disprove the salient fact of self-destruction effected by drinking the poison, wheresoever and howsoever this might have been obtained. In other words, what, if there had been no statutory presumption, it would have been necessary to prove as a link in a chain of evidence is negligible and superfluous when the statute has expressly created the presumption. Only affirmative evidence that the cause of death was something other than Black Leaf 40 or affirmative evidence that Mrs. Bjorkman died from accident, natural causes, or from homicide could validly do away with any part of the presumption. That only affirmative evidence in the accepted sense could be the proper means of impairing or overcoming prima facie proof or a prima facie presumption is apparent from numerous judicial reports, of which a few citations will suffice: *Naggy v. Provident L. & Acc. Ins. Co.*, 218 Ia. 694, 255 N. W. 526; *Wendorff v. Mo. State Life Ins. Co.*, 318 Mo. 363, 1 S. W. (2d) 99; *Bowdon v. Metropolitan Life Ins. Co.*, .. Mo. App. .., 78 S. W. (2d) 474; *Peabody v. Continental Life Ins. Co.*, 128 Neb. 23, 257 N. W. 482; *Missouri State Life Ins. Co. v. Pater*, 15 F. (2d) 737. All the more cogent are these authorities because they do not present a statutory presumption in favor of the contents of the registered death certificate, which exists in this state. In the case at bar not one scintilla of *evidence* tends to show that Mrs. Bjorkman had made a mistake by picking up Black Leaf 40 when she intended to take up something else. Such an hypothesis derives no support from the record before us. On this point there is nothing but bare speculation.

I submit that under the record herein Bjorkman was not entitled to recover the face of the policy, and that every bona fide policyholder of the company was wronged

by the judgment below. Not only so, but if the majority opinion should continue to be the law it will naturally result in unnecessarily increasing the premiums payable to insurance companies on future policies in a laudable field of investment and security for our people. Worst of all, by this court's decision the express legislation of Colorado will then have been judicially ignored and repealed, and deliberate contracts of competent contracting parties can and will be judicially swept away.

As bearing upon the abuse of cross-examination on collateral matters, heretofore discussed, the following Colorado authorities may be read with profit: *Askew v. The People,* 23 Colo. 446, 454-5, 48 Pac. 524, 528; *Boles v. People,* 37 Colo. 41, 52, 86 Pac. 1030, 1033; *Mitsunaga v. The People,* 54 Colo. 102, 108-9, 129 Pac. 241, 244; *McKee v. People,* 69 Colo. 580, 582-3, 195 Pac. 649, 650; *Adams v. People,* 87 Colo. 188, 190-1, 285 Pac. 1102, 1103; *Tourtelotte v. Brown,* 4 Colo. App. 377, 385-6, 36 Pac. 73, 76; *Roesch v. Douglas County,* 11 Colo. App. 280, 282-3, 52 Pac. 1035, 1036. In *Adams v. People, supra,* we said: "Such questions were wholly irrelevant, incompetent and immaterial. They were asked for the evident purpose of embarrassment, and tended to interject collateral issues. The conduct of counsel in so interrogating, or attempting to interrogate a witness should have received severe censure of the trial court, and, if necessary to prevent a repetition, counsel should have been dealt with for contempt of court. Such conduct upon the part of a counsel is absolutely inexcusable. Witnesses are entitled to courteous treatment at the hands of counsel, and this can and should be exacted by courts, so that no witness need fear insult under the guise of cross-examination." Until these principles are observed by trial courts, the danger of prejudice and consequent miscarriage of justice is ever present.

*Hershey v. Agnew,* 83 Colo. 89, 262 Pac. 526, is cited in the majority opinion on the proposition that there is a presumption against suicide. This was not a life insur-

ance case. Besides, such a presumption would have to yield to the positive statutory presumption that is applicable here.

For the various reasons I have stated, I respectfully dissent.